IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

GENERAL CONFERENCE CORPORATION
OF SEVENTH-DAY ADVENTISTS, et al.,

        Plaintiffs,


v.                                         No. 06-1207

WALTER MCGILL d/b/a
CREATION SEVENTH DAY
ADVENTIST CHURCH, et al.,

        Defendant.
_____

ORDER GRANTING IN PART AND DENYING IN PART
THE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
_____

The Plaintiffs, the General Conference Corporation of Seventh-Day Adventists and the

General Conference of Seventh-day Adventists, brought the instant trademark infringement action

against the Defendant, Walter McGill, a pastor of an unincorporated association known as the

Creation Seventh Day Adventist Church.  Before the Court is the motion of the Plaintiffs for

summary judgment.  (Docket Entry ("D.E.") No. 37.)  The Defendant has responded and this motion

is now ripe for disposition.  For the following reasons, the motion is granted in part and denied in

part.

BACKGROUND

General Conference Corporation of Seventh-day Adventists ("Corporation") is a corporation

whose principal place of business is located in Maryland.  (D.E. No. 37, Pls.' Statement of

Undisputed Facts ¶ 9.)  The other Plaintiff, General Conference of Seventh-day Adventists ("General

Conference") is an unincorporated association that represents the interests of the Seventh-day Adventist Church. (Id. ¶ 10.) The General Conference was formed in 1863, marking the official organization of the Seventh-day Adventist Church. (D.E. No. 21, George W. Reid ThD's Expert Report ¶ 13.) The church grew out of several congregations that believed that Christ's Second Advent was imminent and that the Sabbath should be observed on the seventh day of the week. (Id. ¶ 1.) The Plaintiffs' expert, George Reid ThD, asserts that none of these early churches called themselves "Seventh-day Adventist" and that it was not until the congregations came together to create a formal church structure that the name "Seventh-day Adventist" was chosen. (Id. ¶¶ 8-10.) Since the official formation of the church, the names "Seventh-day Adventist" and "SDA" have been used by the Seventh-day Adventist Church as the church's name, and as its trade name in advertising and publishing. (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶ 40.) The church today has approximately 968,604 members in the United States, as well as 3,529 ministers and 5,316 congregations. (Id. ¶ 44.) Worldwide, it has over fourteen million members, 16,892 ministers, and 121,625 congregations. (Id.)

The Corporation holds title to all of the church's assets. (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶ 11.) It has registered the marks "Seventh-day Adventist," "Adventist," and "General Conference of Seventh-day Adventists," with the United States Patent and Trademark Office. (Id. ¶¶ 17-23.) Registration number 1,177,185 protects the use of the "Seventh-day Adventist" mark on religious books, magazines, pamphlets, newsletters, brochures, encyclopedias, dictionaries, commentaries, fliers, bulletins, yearbooks, booklets, and bibles. (Id. ¶ 25.) It also protects its use for the establishment and administration of employee health care and benefit programs and medical insurance programs, as well as educational instruction services at the grade

school, high school, and college level, and for film production and distribution services, health care services, and religious observances and missionary services. (Id.) Registration numbers 1,176,153 and 1,218,657 protects the "Advent" mark for the same purposes. (Id. ¶¶ 26-27.) Registration number 1,171,760 protects the "General Conference of Seventh-day Adventists" mark for church services. (Id. ¶ 28.)[1] "SDA" is an acronym for "Seventh-day Adventist" that has not been registered. (Id. ¶ 36.)[2] The Plaintiffs assert that they are "legally equivalent terms," however, and that "SDA" has been used by the General Conference from 1863 onwards "as part of the corporate name, the trade name, in advertising, in publishing and publications, and in the performance of services." (Id. ¶¶ 40-41.)

The Defendant is the pastor of a church he currently calls "A Creation Seventh Day & Adventist Church," (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 5), although in his Answer to the Complaint he referred to it as the "Creation Seventh Day Adventist Church," (D.E. No. 4, Answer, at 1). His church has three members. (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 7.) There is a second three-member church associated with his, which has the same name and is located in British Columbia,

---

[1] The Court notes that while the Defendant is charged in the Complaint with using the mark "General Conference of Seventh-day Adventists," none of the undisputed facts listed by the Plaintiffs in support of their motion for summary judgement assert that he has used that specific mark. Thus, this Order will not discuss any violation of this trademark by McGill.

[2] Trademark or service mark ownership "is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and actual use in the market." Homeowners Group, Inc. v. Home Mktg Specialists, Inc., 931 F.2d 1100, 1105 (6th Cir. 1991). Thus, even though "SDA" is not a registered trademark, it might still be entitled to protection under trademark law.

Canada.  (Id. at 8-9.)  In addition, there are other congregations that the Defendant "raised up" in the United States, which have been apostatized, or diverted from the faith.  (Id. at 9.)

McGill was originally baptized in a Seventh Day Adventist church affiliated with the Plaintiffs.  (Id. at 16.)  After several years, however, the Defendant decided to separate from the church because of a theological dispute.  (Id. at 18.)  In 1990, McGill formed his current church, taking its name from a divine revelation.  (Id. at 34, 37.)  While the Defendant was aware that the Plaintiffs had trademarked the name "Seventh Day Adventist," he used it anyway, because he believed that he was divinely mandated to do so.  (Id. at 40.)  McGill has also created the following internet domain names, among others: "7th-day-adventist.org," "creation-7th-day adventist-church.org," "creationseventhday-adventistchurch.org," "creationsda.org, and "csda.us." (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶¶ 13-14.)  The Plaintiffs have not granted him any licenses to use their marks.  (Id. ¶ 33.)

## STANDARD OF REVIEW

Rule 56 (c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms, Inc., 862 F.2d 597, 601 (6th Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine

issue for trial." Celotex, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

The Plaintiffs charge McGill with 1) trademark infringement in violation of 15 U.S.C. § 1114; 2) engagement in unfair trade practices in violation of § 1125(a), 3) dilution of their trademarks in violation of § 1125(c), and 4) engagement in cyberpiracy by appropriating their trademarks in domain names in violation of § 1125(d)(1). (See D.E. No. 1 Compl. ¶¶ 42-56.) The Complaint also alleges that the Defendant committed unfair or deceptive trade practices in violation of Tennessee's Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101 et seq., as well as common law infringement of the Plaintiffs' marks, common law unfair competition, and injury to business reputation or dilution of the Plaintiffs' marks in violation of section 47-25-513 of the Tennessee Code. (Id. ¶¶ 57-70.) The Plaintiffs seek injunctive relief, damages, and attorneys' fees. (See D.E. No. 1, Compl., 17-20.)

The Sixth Circuit has held that both trademark infringement and unfair competition claims require courts to determine whether there is a likelihood of confusion regarding the source of the products and, therefore, these claims can be analyzed together.  AutoZone, Inc. v. Tandy Corp., 373 F.3d 786, 791 (6th Cir. 2004); see also Audi AG v. D'Amato, 469 F.3d 534, 542 (6th Cir. 2006) (citation omitted) ("[W]e use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks."); Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 288 (6th Cir. 1997) (stating that claims brought pursuant to § 1125(a) "mirror the previously discussed federal claim of trademark infringement by also requiring proof of a likelihood of confusion."). Tennessee unfair competition claims and common law infringement claims are analyzed under the same standards as federal claims.  Microsoft Corp. v. Sellers, 411 F. Supp. 2d 913, 920 (E.D. Tenn. 2006) ("Likelihood of customer confusion is the essence of the test for a violation of the Tennessee Consumer Protection Act.") (citation omitted); Men of Measure Clothing, Inc. v. Men of Measure, Inc., 710 S.W.2d 43, 48 (Tenn. Ct. App. 1986) (denying a petition to rehear and rejecting the argument that federal and Tennessee courts differ in their application of the likelihood of confusion test to infringement claims).  Thus, all of the Plaintiff's trademark infringement and unfair competition claims will be analyzed in the first section of the Order.  The Plaintiffs' remaining claims will be discussed in Section Two.

I.     Trademark Infringement and Unfair Competition Claims

The General Conference and the Corporation argue that they should be granted summary judgment because their trademarks are incontestible pursuant to 15 U.S.C. § 1065 and there is a likelihood of confusion between the "mother" church they represent and the Defendant's church.

(See, generally, D.E. No. 37, Mem. in Supp.)  McGill contends in response that the marks have become generic, or, in the alternative, that they are descriptive but have not acquired secondary meaning, and that there is no chance of confusion between the Plaintiffs' and his churches.  (See, generally, D.E. No. 56, Def.'s Resp.)  The Court will first determine the validity of the Plaintiffs' marks and then apply the likelihood of confusion test.

A.     Validity of the Marks

The Sixth Circuit has held that "'[t]he existence and extent of trademark protection for a particular term depends on that term's inherent distinctiveness. Courts have identified four general categories of terms: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.'" Bath & Body Works, Inc. v. Luzier Personalized Cosmetics, Inc., 76 F.3d 743, 748 (6th Cir. 1996) (quoting Blinded Veterans Ass'n v. Blinded Am. Veterans Found., 872 F.2d 1035, 1039 (D.C. Cir. 1989)).  A generic term is one that is commonly used as the name of a particular good or a description thereof.  Id. (citation omitted).  It is the weakest type of mark and cannot become a trademark.  Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1117 (6th Cir. 1996).  A descriptive term is the next-weakest.  Id.  It "'specifically describes a characteristic or ingredient of an article.  It can, by acquiring a secondary meaning, i.e., becoming 'distinctive of the applicant's goods' . . . become a valid trademark.'" Bath & Body Works, 76 F.3d at 748 (quoting Induct-O-Matic Corp. v. Inductotherm Corp., 747 F.2d 358, 362 (6th Cir. 1984)).

A suggestive term suggests an ingredient or characteristic of a good and requires the public to use its imagination to determine the nature of that good.  Champions Golf Club, 78 F.3d at1117 (citation omitted).  "Examples are CITIBANK, which connotes an urban or modern bank, or GOLIATH, for wood pencils, connoting a large size . . . .  A suggestive term is considered stronger

than one that is merely descriptive, and does not require proof of secondary meaning." Id. (internal citations omitted). Fanciful and arbitrary marks are the strongest. Id. (citation omitted). A fanciful mark is "a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned." Little Caesar Enter., Inc. v. Pizza Caesar, Inc., 834 F.2d 568, 571 (6th Cir. 1987). Examples include Exxon and Kodak. Id. An arbitrary mark "has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached," such as Apple computers or Camel cigarettes. Id.

15 U.S.C. § 1065 provides that, under certain circumstances, a mark becomes incontestible five years after it has been registered.[3] In this case, the Plaintiffs argue that because their registered marks have met all the requirements of § 1065, they are incontestible and subject only to certain enumerated defenses listed in 15 U.S.C. § 1115(b). (D.E. No. 37, Mem. in Supp., at 4-5.) The Court notes that this argument does not apply to the mark "SDA," which has not been registered. McGill does not challenge the assertion that the "Seventh-day Adventist" and "Adventist" marks are incontestable, but maintains that the Plaintiffs' marks have become generic because they refer to a religion or a set of religious beliefs, rather than to a specific church or denomination. (D.E. No. 56, Def.'s Resp., at 4-12.)

A mark's incontestable status does not protect it from a challenge that it is or has become generic. Nartron Corp. v. STMicroelectronics, Inc., 305 F.3d 397, 405 (6th Cir. 2002). The

_____

[3] To become incontestable, the registrant must file an affidavit with the United States Patent and Trademark Office five years after registering the mark, which asserts that no final decision adverse to the registrant's claim of ownership over, or the right to register, the mark has been rendered and that there is no proceeding involving those matters pending. 15 U.S.C. § 1065.

Plaintiffs' registered marks merely benefit from a presumption that they are not generic and McGill bears the burden of showing that they are. Id. The question of whether a term is generic is a question of fact. Bath & Body Works, 76 F.3d at 748 (citation omitted). The appropriate test for whether a mark is generic is "'whether the public perceives the term primarily as the designation of the article.'" Bath & Body Works, 76 F.3d at 748 (quoting Blinded Veterans Ass'n, 872 F.2d at 1041).

(i)      "Seventh-day Adventist" Mark

In Stocker v. General Conference Corp. of Seventh-Day Adventists, 39 U.S.P.Q.2d 1385, 1996 WL 427638, at *17 (Feb. 15, 1996), the Trademark Trial and Appeal Board held that "the term [Seventh-day Adventist] indicates products and/or services of a single source (i.e., General Conference) and, therefore, the term functions as a trademark/servicemark" and is not generic. The evidence the court considered relevant in deciding this issue included 1) the testimony of an expert in religious history on the subject of whether the term "Seventh-Day Adventist" was associated with one or many churches, 2) various dictionary definitions and encyclopedia entries on the term "Seventh-Day Adventist," 3) survey evidence studying public attitudes towards the Plaintiffs' church, and 4) other printed publications using the name "Seventh-Day Adventist" to refer to the so-called "mother" church. Id. at *11-18.

A federal court in the Southern District of Florida similarly held that the term "Seventh-day Adventist" is not generic when it is used as a church name. Seventh-Day Adventist Gen. Conference Corp. of Seventh-Day Adventists v. Perez, 97 F. Supp. 2d 1154, 1162 (W.D. Fla. 2000). The court based its holding on the history of the church, specifically, its conclusion that the term only came into common use in 1860, around the time when the Seventh-Day Adventist Church was

officially organized.  Id.  Furthermore, the court noted that surveys submitted by the plaintiff convinced it that most of the public identified the term with the General Conference's Church, not with a religion.  Id.

Another district court, this one in the Central District of California, reached a different conclusion, holding that  "the term 'Seventh-day Adventist' has a dual meaning: it refers not only to the Church, but to adherents of the religion of Seventh-day Adventism."  Gen. Conference Corp. of Seventh-Day Adventists v. Seventh-Day Adventists Kinship, Int'l, No. CV-87-8113 MRP, 1991 WL 11000345, at *6 (C.D. Cal. Oct. 7, 1991).  According to the court, "there is no term that adequately describes an adherent to the religion of Seventh-day Adventism, other than 'Seventh-day Adventist'; the only possible alternative would be 'Adventist,' and that term is too broad."  Id. Thus, the court found that a support group for gay adherents of Seventh-day Adventism could call themselves "SDA Kinship," without violating the General Conference's trademark in the term.  Id. at *6-7.  However, the court noted that it might have come to a different conclusion had the case involved another church adopting the name "Seventh-day Adventist."  Id. at *7 ("Arguably, use of the name 'Seventh-day Adventist' in conjunction with 'Church' would require a different result.").

The Defendant insists that the Plaintiffs' marks have become generic because "Seventh-Day Adventism . . . has evolved into a religion that has several denominations of followers who are all known as Seventh-Day Adventists." (D.E. No. 56, Def.'s Resp., at 5.)[4]  In support, he contends that there are at least two other break-away churches, in addition to his own, that are not affiliated with the General Conference and that use the term "Seventh-day Adventist" in their name: the Seventh

_____

[4] According to the Defendant, a theology graduate student named Russell Kelly also argues that "Seventh-day Adventist" is a generic term to describe a religion.  (Id. at 11.)

Day Adventist Reform Movement, which was started in 1915, and the Davidian Seventh Day Adventists, founded in 1942. (D.E. No. 26, Def.'s Resp., at 5.) McGill also points out that there are denominations that use the terms "Seventh-Day" or "Adventist" separately in their names, for example, the Seventh-Day Baptists. (Id. at 9.) Thus, the Defendant concludes that the terms "Seventh-Day" and "Adventist" are generic and the mark "Seventh-day Adventist" is invalid. (Id. at 8-9 (citing Blinded Veterans Ass'n, 872 F.2d at 1041-42).)

The Court finds that the evidence presented by the Defendant is not sufficient to overcome the presumption that the Plaintiffs' "Seventh-day Adventist" mark is not generic. The fact that two other small churches utilize the name does not establish that the relevant public does not associate it with the "mother" church. If anything, the fact that the Defendant can point to only two other splinter groups founded in the last century that bear the name supports the conclusion that members of the relevant public would generally associate the term with the churches affiliated with the General Conference.[5] The Court also rejects the argument that the mark is generic because it "simply designates the twice-circumscribed category of people" who believe in celebrating the Sabbath on the seventh day of the week and in the imminent return of Jesus Christ. Compare Blinded Veterans Ass'n, 872 F.2d at 1041 (finding that the term "blinded veterans" was a generic term composed of two generic words that together simply referred to former servicemen who have lost their eyesight). This case differs from Blinded Veterans, because the mark at issue in that case was unregistered and, thus, the burden was on the plaintiff to prove that the term was not generic,

---

[5] The Trademark Trial and Appeal Board in Stocker considered the relevant public to consist of "Christians and, more specifically, Adventist Christians (that is, those who believe in the nearness of the second coming of Christ). It is these persons who are most likely to avail themselves of [General Conference]'s publications and services." 1996 WL 427638, at *11. The Court adopts this well-reasoned conclusion.

rather than on the defendant to prove to the contrary.  Id. at 1041.  In this case, the Plaintiffs benefit from a presumption that "Seventh-day Adventist" is not generic.  Furthermore, the term "blinded veterans" is a term that the public would undoubtedly associate primarily with "former members of the armed forces who have lost their vision," rather than with an organization that incorporated that term into its name.  Id. at 1041.  By contrast, the term "Seventh-day Adventist" did not come into being until the Plaintiff's church bearing that name was founded in the mid-nineteenth century.  (D.E. No. 21, George W. Reid ThD's Expert Report ¶¶ 8-10.)  And, as the Defendant concedes, at best only a few congregations have adopted that name since, all of whom split off from the Plaintiffs' church.  Thus, the Court cannot assume that the relevant public would view the term as a way to refer to a person who believes that the Sabbath should be celebrated on the seventh day and that the return of Jesus Christ is imminent and not primarily as a means of reference to a member of the Plaintiffs' church.  Last, the Defendant's personal opinion and that of a former minister in his church, Russell Kelly, that the term is generic does not assist the Court in ascertaining  how it is viewed by Christians in general, or Adventist Christians in particular.

The Defendant has not introduced any survey evidence that shows whether the relevant public believes that the term "Seventh-day Adventist" refers to a religion or to a specific denomination, despite the fact that such evidence is increasingly common in trademark disputes.  See 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 12:14 (4th ed. 1996) ("Consumer surveys have become almost de rigueur in litigation over genericness.").  Instead, he challenges a 1999 survey that the Plaintiffs have introduced on the basis that it is outdated and does not show that the term is not generic.  (D.E. No. 56, Def.'s Resp., at 6.)[6]  This survey found that 44%

---

[6] McGill also references two earlier surveys mentioned by the Plaintiffs, which have not been submitted to the Court and therefore will not be considered.

of the general public, consisting of adults 18 years and older, associated the term "Seventh-day Adventist" with a religious organization or church. Only 13% thought of it as a religion. (D.E. No. 21, Harry O'Neill, Expert Report, at 14.)

McGill first argues that the survey results are misleading because of the way the questions were formulated. According to the Defendant, the survey did not ask "whether people associate the term 'Seventh-Day Adventist' with the name of a religion or the name of a church," but inquired instead what *organization* the respondents associated the term with. (D.E. No. 56, Mem. in Opp., at 6-7.) In response to that question, 23% of the general public replied a "religious organization or group," 18% replied a "church," and 5% replied a "church organization or group." (D.E. No. 21, Harry O'Neill's Expert Report, at 14.) After answering that question, the respondents were then asked what else, if anything, they associated the term with. (D.E. No. 21, Appendix to Harry O'Neill's Expert Report, Part A - Questionnaire, at 2.) Thirteen percent replied a "religion." (D.E. No. 21, Harry O'Neill's Expert Report, at 14.) When only the answers of those who had heard of Seventh-day Adventists are considered, the percentage of respondents who associated the term with a religion increases to 17%. (Id.)

The Court agrees with the Defendant's argument that the phrasing of the survey questions makes it difficult to determine whether the respondents associated the term "Seventh-day Adventist" *only* with the General Conference. The phrasing of the first question appears formulated to elicit a response that would support the Plaintiffs' position, because the respondents were specifically asked to identify a *type of organization*. Even those who thought of it as a religion, rather than a single church, would probably reply that the type of organization they associated it with was a religious organization or church. The follow-up inquiry of what else the respondents thought of

upon hearing the term does not remedy this deficiency because it is too general. Nonetheless, these faults in the survey do not provide any evidence that the term "Seventh-day Adventist" is generic. They only weaken the evidence that it is not. Thus, it does not help the Defendant overcome the presumption that "Seventh-day Adventist" is not a generic mark.

Next, the Defendant contends that even if there is no issue of material fact as whether this mark has become generic, the Court should hold that a genuine issue of material fact exists as to whether it is descriptive, but has not acquired secondary meaning. (D.E. No. 56, Def.'s Resp., at 14.12-14.) As stated above, a descriptive term "'can, by acquiring a secondary meaning . . . become a valid trademark.'" Bath & Body Works, 76 F.3d at 748 (quoting Inductotherm Corp., 747 F.2d at 362). To acquire a secondary meaning,

> an article of merchandise when shown to a prospective customer must prompt the affirmation, 'That is the article I want because I know its source,' and not the negative inquiry as to 'Who makes that article?' In other words, the article must proclaim its identification with its source, and not simply stimulate inquiry about it.

Champions Golf Club, 78 F.3d at 1117 (quoting Esercizio v. Roberts, 944 F.2d 1235, 1239 (6th Cir. 1991)).

McGill's argument that the Plaintiffs' registered mark is descriptive, but has not acquired secondary meaning, is without merit, because the mark is incontestable pursuant to 15 U.S.C. § 1065. The Supreme Court's has held that "[t]he language of the Lanham Act . . . refutes any conclusion that an incontestable mark may be challenged as merely descriptive." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 196 (1985); see also AutoZone v. Tandy Corp., 373 F.3d 786, 794 (6th Cir. 2004) (stating that once a mark is incontestable, an infringement action cannot be defended on the ground that the mark is merely descriptive) (citation omitted). Thus, even if the

mark "Seventh-day Adventist" is merely descriptive, without having acquired secondary meaning, the Defendant cannot defend this lawsuit on that basis.

(ii)      <u>"Adventist" Mark</u>

The Court finds that there is a material issue of fact as to whether the registered mark "Adventist" is generic. As with the mark "Seventh-day Adventist," there is a presumption that the mark is not generic because all the requirements of 15 U.S.C.§ 1065 have been met. <u>Nartron Corp.</u>, 305 F.3d at 405. To rebut the presumption, McGill points to a dictionary definition of "Adventism" as "the doctrine that the second coming of Christ and the end of the world are near at hand." Webster's Ninth New Collegiate Dictionary 59 (1985). The secondary definition is "the principles and practices of Seventh-Day Adventists." <u>Id.</u> The Defendant also submits Wikipedia's[7] entry on Adventism, which provides that the term "Adventist" generally refers to someone who believes in the Second Advent of Jesus. <u>See</u> http://en.wikipedia.org/wiki/Adventism. The entry states that there are over nine churches in the "Adventist family," including Jehovah's Witnesses, Seventh-day Adventists, and the Advent Christian Church. <u>Id.</u> Both the dictionary definition and the Wikipedia entry support the conclusion that the term "Adventist" refers to a set of beliefs, rather than to the churches led by the General Conference. <u>See also</u> <u>Stocker</u>, 1996 WL 427638, at *15 ("Contrary to petitioners' arguments, the definitions tend to support, if anything, our view that the generic term for the religion is 'Adventist' (or 'Adventism'), not 'Seventh-day Adventist.'"). Therefore, the Plaintiffs' motion for summary judgment on this issue is DENIED.

---

[7] Wikipedia is a volunteer-edited online encyclopedia. <u>See</u> http://en.wikipedia.org/wiki/Wikipedia:About

(iii)  "SDA" Mark

Because "SDA" is not a registered trademark, the burden is on the Plaintiffs to prove that the term is valid.  Blinded Veteran's Ass'n, 872 F.2d at 1041 (citation omitted).  However, the Plaintiffs do not analyze the validity of "SDA" separately from the validity of their incontestable marks.  (See D.E. No. 37, Mem. in Supp., at 4-5.)[8]  The General Conference and the Corporation do provide the above-described survey to support the finding that their marks are not generic, but this evidence does not relate to the mark "SDA," because the respondents in the survey were only asked about how they viewed the term "Seventh-day Adventist."  (See D.E. No. 21, Harry O'Neill's Expert Report, at 14-15.)  Next, the Plaintiffs support their contention that the controverted marks are at least descriptive and that they have secondary meaning with a discussion on the length and exclusiveness of their use of the marks, but they provide no evidence on how the mark "SDA" is perceived by the public. (See D.E. No. 37, Mem. in Supp., at 9-11.)  Because secondary meaning is established by showing that, "'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself,'" the Court cannot conclude that the Plaintiffs have satisfied their burden of showing that the mark "SDA" is valid.  DeGidio v. West Group Corp., 355 F.3d 506, 513 (6th Cir. 2004) (quoting Inwood Labs., Inc. v. Ives Labs., 456 U.S. 844 851 n.11 (1982)).  Furthermore, the Plaintiffs, presumably relying on the incontestability of their other marks and their unsupported and unexplained assertion that "SDA" is "legally equivalent" to one of them, do not even bother to explain why "SDA" is a descriptive

---

[8] While the General Conference and the Corporation assert that the acronym is "*legally* equivalent" to the mark "Seventh-day Adventist," the Defendant disputes the assertion to the extent it implies that the mark is not generic.  (Compare D.E. No. 37, Pls.' Statement of Undisputed Facts ¶ 41 (emphasis added) with D.E. No. 56, Def.'s Resp. to Pls.' Statement of Undisputed Facts ¶ 41.)

mark, rather than a generic one, focusing their attention instead on why all three of their marks have secondary meaning.  (See D.E. No. 37, Mem. in Supp. at 9-11.)  Because "SDA" is unregistered, however, and the Plaintiffs have provided the Court with no basis for concluding that it is "legally equivalent" to "Seventh-day Adventist," the burden is on them to establish that "SDA" "'specifically describes a characteristic or ingredient of an article. . . .'" and has acquired secondary meaning.  Bath & Body Works, 76 F.3d at 748 (quoting Induct-O-Matic Corp. v. Inductotherm Corp., 747 F.2d 358, 362 (6th Cir. 1984)).  This burden they have not met.

B.     Likelihood of Confusion

To prove liability for trademark infringement, a plaintiff must establish that a defendant's use of its mark  is "likely to cause confusion among consumers."  Interactive Products Corp. v. A2Z Mobile Office Solutions, Inc., 326 F.3d 687, 694 (6th Cir. 2003) (quoting Daddy's Junky Music Stores, 109 F.3d at 280).   The burden remains on the plaintiff, even when the marks are incontestable.  KP Permanent Make-Up, Inc. v. Lasting Impressions I, Inc., 543 U.S. 111, 118 (2004) (stating that section 1115(b) nonetheless "places the burden of proving likelihood of confusion (that is, infringement) on the party charging infringement *even when relying on an incontestable registration*") (emphasis added).  In other words, the Plaintiffs must show that there is no issue of material fact as to whether McGill's use of its trademarks is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.  Interactive Prods., 326 F.3d at 694.  In this case, these goods consist of religious services and publications.

The Sixth Circuit has listed the following factors used by courts to determine whether a likelihood of confusion exists: "1) the strength of the senior mark; 2) relatedness of the goods and services; 3) the similarity of the marks; 4) evidence of actual confusion; 5) the marketing channels

used; 6) likely degree of purchaser care; 7) the intent of the defendant in selecting the mark; and 8) the likelihood of expansion of the product lines." Id.; see also Daddy's Junky Music Stores, 109 F.3d at 280-88 (6th Cir. 1997) (discussing each factor in detail). Each case is different and not all factors may be useful in a given case. Interactive Prods., 326 F.3d at 695 (quoting Homeowners Group, 931 F.2d at 1107). The factors are not indispensable, but may assist the court in determining whether a likelihood of confusion exists. Id. The Court adopts these factors as a useful analytical guide and discusses them below.

As to the first factor, the Sixth Circuit has held that a mark that has become incontestable pursuant to 15 U.S.C. § 1065 should be presumed to be strong for purposes of determining likelihood of confusion. Wynn Oil Co. v. Am. Way Serv. Corp., 943 F.2d 595, 600 (6th Cir. 1991).[9] Nonetheless, lower courts have "proceeded to examine evidence that rebuts that presumption." Sports Auth., Inc., 965 F. Supp. at 937. In this case, the Defendant argues that the mark "Seventh-day Adventist" is weak because it is descriptive and lacking in secondary meaning. (D.E. No. 56, Def.'s Resp., at 16-17.) According to McGill, the expansion of the "mother" church and the passage of time have rendered the mark less distinctive. (Id. at 12-13.) The Defendant's argument is long on theory and short on facts, however. McGill analogizes the history of the Seventh-day Adventist church to that of the Baptist, Catholic, and Presbyterian churches, and argues that like these, Seventh-day Adventism has split into many factions. (Id. at 13.) He claims that the formation of his own church and two small denominations during the last century show that the mark has lost all secondary meaning. The Defendant provides no direct evidence, however, that the public does

---

[9] This position has also been adopted by the Eleventh Circuit, but has been criticized by the Second, Fourth, Fifth, Seventh, and Ninth Circuits. Sports Auth., Inc. v. Abercrombie & Fitch, Inc., 965 F. Supp. 925, 936 n.10 (E.D. Mich. 1997).

not associate the mark with the Plaintiffs. Thus, the Court concludes that McGill has not overcome the presumption that the incontestable mark "Seventh-day Adventist" is strong. <u>See also</u> <u>Perez</u>, 97 F. Supp. 2d at 1159 (holding that the mark "Seventh-day Adventist" was at least descriptive, with secondary meaning, or suggestive).[10]

With regard to the second factor, relatedness of the goods and services, the Defendant concedes that its goods and services are connected to those of the Plaintiffs, because both are churches that share similar beliefs and provide religious services in line with those beliefs. (D.E. No. 56, Def.'s Resp., at 17.)

When considering the third factor, similarity of the marks, courts must regard the marks in their entirety and examine how they are viewed in the marketplace. <u>Homeowners Group</u>, 931 F.2d at 1109 (citation omitted). "'[T]he court must determine whether the alleged infringing mark will be confusing to the public when singly presented,'" rather than side by side. <u>Beer Nuts, Inc. v. Clover Club Foods Co.</u>, 711 F.2d 934, 941 (10th Cir. 1983) (quoting <u>Avrick v. Rockmont Envelope Co.</u>, 155 F.2d 568, 573 (10th Cir. 1946)). The official name of McGill's church is now "A Creation Seventh Day & Adventist Church," (D.E. No. 56, Def.'s Resp., at 18), although the Court notes that as recently as October 17, 2006, the Defendant referred to it as the "Creation Seventh Day Adventist Church," (D.E. No. 4, Def.'s Answer, at 1). Furthermore, McGill has created internet domain names that incorporate the Plaintiffs' mark in its entirety. (D.E. No. 37, Pls.' Statement of Undisputed Facts ¶¶ 13-14.)

---

[10] Because the Court has held that the Defendant has raised an issue of material fact as to whether "Adventist" and "SDA" are valid marks, the Court will only apply the likelihood of confusion test to "Seventh-day Adventist."

The Defendant claims that the addition of the word "Creation" to the name of the church, the capitalization of the word Day, and use of an ampersand eliminates any confusion. (D.E. No. 56, Def.'s Resp., at 18.) While this might be true if the two church names are viewed side by side, it is foreseeable that members of the public who see the Defendant's church sign in passing may confuse his church with one of the Plaintiffs'. It is doubtful that the capitalized "D" and the ampersand would be immediately noticeable to passers-by. Additionally, none of the domain names include the capitalization of the letter "D" or the ampersand. The fact that McGill has added the word "Creation" to the Plaintiffs' mark also does not sufficiently distinguish it, because the Plaintiffs' strong three-word mark appears *in full* thereafter, with the words in the original order. Thus, this case is different from National Board of YWCA v. YWCA of Charleston, 335 F. Supp. 615, 629 (D.S.C. 1971), where the court held that the Defendant could use the mark "Young Women's Christian Organization," or its abbreviation, "Y.W.C.A.," if it rearranged the order of the words or letters. See also Perez, 97 F. Supp. 2d at 1157-58 ("The inclusion of Eternal Gospel Church in the title Eternal Gospel Church of Seventh Day Adventists does not reduce the danger of potential confusion in light of the overwhelming similarity of the marks.").

The Plaintiffs rely heavily on the fourth element, evidence of actual confusion, in their motion for summary judgment. (See D.E. No. 37, Mem. in Supp., at 6-8.) Proof of actual confusion is the best evidence of likelihood of confusion. Homeowners Group, 931 F. 2d at 1110. The degree of confusion and the kinds of persons confused are as important as the number of instances of confusion. Id. Examples of short-lived confusion or confusion by individuals who are only casually acquainted with the product in question is worthy of little weight, while "chronic mistakes and serious confusion of actual customers are worthy of greater weight." Id. (citation omitted). The

only evidence of actual confusion presented by the Plaintiffs are entries in the guest book of the Defendant's website by visitors to the site. (D.E. No. 37, Mem. in Supp., at 6-8.) Several of these visitors identify themselves as Seventh Day Adventists and comment on the contents of the website or ask for information on McGill's church. (Id. at 7.) For example, one visitor stated that he was a Seventh-Day Adventist looking for "internet friendships," while another complimented the Defendant's "description about the New Start Program," and yet another asked that McGill pray for her. (D.E. No. 37, Pls.' Mem. in Supp., at 7.) However, these somewhat ambiguous entries do not conclusively indicate that these visitors mistakenly believed that the Defendant's church was part of the "mother" church; viewed in the light most favorable to the Defendant, these comments only reveal a casual interest in *his* church or a sense of kinship towards another church with shared beliefs. Thus, there is no persuasive evidence of actual confusion. Because such evidence is hard to find, however, a *lack* of evidence of actual confusion is rarely significant. Daddy's Junky Music Stores, 109 F.3d at 284.

McGill acknowledges that the fifth factor, marketing channels used, points in favor of the conclusion that the public would confuse his church with that of the Plaintiffs. (D.E. No. 56, Def.'s Resp., at 17.)

The sixth factor, the likely degree of purchaser care, does not weigh in favor of finding that there is a likelihood of confusion.

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . . . when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

Homeowners Group, 931 F. 2d at 1111.  As the Defendant points out, it is difficult to imagine someone accidentally becoming a member of his church, while believing that it is affiliated with the General Conference, given that the amount of care most people take in selecting a church is significantly greater than the amount of care they might take in making a consumer purchase. However, the Sixth Circuit has held that where two marks are very similar, as they are in this case, purchaser care decreases the likelihood of confusion only minimally.  Daddy's Junky Music Stores, 109 F.3d at 286.

The seventh factor considers the intent of the Defendant in selecting the mark.  The Plaintiffs argue that it is without dispute that McGill's use of the mark was intentional, given that he was once a member of the Seventh-day Adventist church.  (D.E.  No. 37, Mem. in Supp.,  at 8.)  However, while the use of the mark was certainly knowing, there is no evidence that the Defendant intended to confuse the public into believing that his church was one of the Plaintiffs'.  See Homeowners Group, 931 F. 2d at 1111 ("If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.") (citation omitted).  Rather, the proof supports the conclusion that McGill chose the name for his church based on a divine revelation.  (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 37.)  The Sixth Circuit has found, however, that while evidence of intent to copy the plaintiff's marks may demonstrate a likelihood of confusion, a lack of such evidence is irrelevant.  Daddy's Junky Music Stores, 109 F.3d at 287.

Last, the Defendant concedes that the eighth factor, likelihood of expansion of the product lines, supports the finding that a likelihood of confusion exists.  (D.E. No. 56, Def.'s Resp., at 17.)

Viewing the facts in the light most favorable to McGill, the Court finds that there is no issue

of material fact as to whether there is a likelihood of confusion between the Plaintiffs' and the Defendant's churches. Almost every single factor weighs in the Plaintiffs' favor; those that do not are less worthy of consideration when they favor an alleged infringer. See Daddy's Junky Music Stores, 109 F.3d at 284-87. Thus, the Court concludes that the Plaintiffs have established that McGill violated trademark infringement and unfair competition laws by using the mark "Seventh-day Adventist" without permission.

The Defendant raised in his Answer several defenses, on which the Plaintiffs have moved for summary judgment, but to which the Defendant did not respond. They include: 1) enforcement of the trademarks would violate the First Amendment; 2) the claims are barred by the doctrine of laches; 3) the Plaintiffs are barred by the fair use doctrine; 4) McGill does not use the marks in interstate commerce; and 5) the Plaintiffs have deviated from their own religious doctrines. (D.E. No. 4, Answer ¶¶ 71-73, 75-76.) The Court will discuss these in turn.

As to the Defendant's first defense, this Court has already held that the Free Exercise Clause of the First Amendment is not implicated in determining the trademark and intellectual property rights of religious organizations. (D.E. No. 61, Order Denying Def.'s Mot. to Dismiss, at 4.)

The laches defense is also inapplicable to this case. When deciding whether a suit is time-barred under the doctrine of laches, a court should consider "'(1) whether the owner of the mark knew of the infringing use; (2) whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and (3) whether the infringing user was unduly prejudiced by the owner's delay.'" Audi AG, 469 F.3d at 545-46 (quoting Kellogg Co. v. Exxon Mobil Corp., 209 F.3d 562, 569 (6th Cir. 2000)). In this case, the Defendant had been using the Plaintiffs' marks for approximately fifteen years when the Complaint was filed. However, McGill has presented no

evidence in response to the Plaintiffs' motion for summary judgement on this issue as to when the General Conference or the Corporation first learned of his use of the marks, nor whether any delay in bringing suit was inexcusable or unreasonable. Furthermore, he has not argued that he was unduly prejudiced by the delay in bringing suit. Thus, the Court concludes that McGill has not raised an issue of material fact as to whether he can establish the defense of laches.

The Defendant also cannot prove that the fair-use doctrine is applicable. The use of an incontestable mark is permissible, even when there is a likelihood of confusion, when the "term is used descriptively, not as a mark, fairly, and in good faith." KP Permanent Make-Up, 543 U.S. at 124; 15 U.S.C. § 1115(b)(4). The Plaintiffs argue that the fact that they have established that there has been actual confusion as to the origin of the Defendant's goods precludes McGill from establishing fair use. (D.E. No. 37, Mem. in Supp., at 18.) However, as noted above, the evidence provided by the Plaintiffs to establish actual confusion, when viewed in the light most favorable to the Defendant, only reveal a casual interest in his church. The Plaintiffs also contend that McGill cannot establish fair use because he adopted their mark in bad faith. Specifically, they contend that the Defendant's knowing adoption of the term "Seventh-day Adventist" was an attempt to "trade on the good will and product identifier of Plaintiff[s]." (Id.) Again, as discussed above, viewed in the light most favorable to McGill, the evidence supports the conclusion that the Defendant chose the name for his church based on a divine revelation, rather than a desire to profit from any already-established good-will towards the Plaintiffs' church. (D.E. No. 37 Ex. 2 to Pls.' Statement of Undisputed Facts, Dep. of Walter McGill, at 37.)

The Court nonetheless finds that McGill cannot avail himself of the fair use doctrine, because his use of the mark was a trademark use. 15 U.S.C. § 1127 defines a trademark as "word, name,

symbol, or device" used "to identify and distinguish" certain goods from others. The Plaintiffs'
"Seventh-day Adventist" mark was used by McGill to identify and distinguish his church, which he
named either "Creation Seventh-day Adventist Church" or "Creation Seventh Day & Adventist
Church." Furthermore, the Defendant advertises his church both online and by the use of a
prominent sign displayed in front of his church. See, e.g., http://csda.us; http://creation-seventh-day-
adventist-church.org. Thus, because McGill utilizes the Plaintiffs' mark to identify and advertise
his church, he cannot rely on the fair use doctrine to defend this suit. See Gen. Conference Corp.
of Seventh-Day Adventists, 1991 WL 11000345, at *4 (holding that fair use did not apply when "the
term 'Seventh-day Adventist' [was] used in the name of defendant's organization, which is
prominently displayed in [its] advertising. The use of the name as an 'attention-getting symbol'
makes it a trademark use, not protected as a fair use.") (citation omitted).

Next, because the Defendant used the Plaintiff's mark on the internet, his defense that he did
not "employ the name CREATION SEVENTH DAY ADVENTIST in commerce" is without merit.
(D.E. No. 4, Answer ¶ 75.) At least one circuit has held that "the jurisdiction of the Lanham Act
constitutionally extends to unauthorized uses of trademarks on the Internet," because "the Internet
is generally an instrumentality of interstate commerce." Utah Lighthouse Ministry v. Found. for
Apologetic Info. & Research, – F.3d –, 2008 WL 2204387, at *5 (10th Cir. 2008).

Last, the Court declines McGill's invitation to hold that the Plaintiffs' mark is invalid
because their church has deviated from its own doctrine. Such an inquiry would certainly violate
the First Amendment. Furthermore, the Court has found no authority where this theory was deemed
an appropriate defense against trademark infringement and unfair competition claims. Thus, the
Defendant has not raised a viable defense.

II.    Remaining Claims

Remaining are the Plaintiffs' cyberpiracy claim, brought pursuant to 15 U.S.C. § 1125(d) and their dilution claims, brought under federal law, 15 U.S.C. § 1125(c), and state law, Tenn. Code Ann. § 47-25-513.  The Court denies summary judgement on these contentions because the Plaintiffs did not address them in their motion.  The bulk of the motion consists of a discussion of the likelihood of a confusion test and the argument that the marks in question are not generic, but are at least descriptive, with secondary meaning.  However, the likelihood of confusion test is not relevant to a determination of whether a defendant has violated either the federal or Tennessee anti-dilution law.  AutoZone, 373 F.3d at 801 (analyzing the federal and Tennessee anti-dilution statutes interchangeably and stating that dilution law is not based on a likelihood of confusion standard); Kellogg Co. v. Exxon Mobil Corp., 192 F. Supp. 2d 790, 797 (W.D. Tenn. 2001) (noting that Tennessee modeled its anti-dilution statute, Tenn. Code Ann. § 47-25-513, on the federal law).[11]  The inquiry into whether a defendant has committed cyberpiracy pursuant to 15 U.S.C. § 1125(d) includes an analysis of whether a plaintiff's mark is identical or confusingly similar to a defendant's domain name, but focuses heavily on whether the defendant "has a bad faith intent to profit from that mark . . . ."  15 U.S.C. § 1125(d)(1)(A)(i);  see also Lucas Nursery & Landscaping, Inc. v. Grosse, 359 F.3d 806, 809-10 (6th Cir. 2004) ("One of the [statute]'s main objectives is the protection of consumers from slick internet peddlers who trade on the names and reputations of established brands.").   The statute lists  nine factors that courts can use

---

[11] The five elements of a successful anti-dilution claim are: "'[T]he senior mark must be (1) famous; and (2) distinctive. Use of the junior mark must (3) be in commerce; (4) have begun subsequent to the senior mark becoming famous; and (5) cause dilution of the distinctive quality of the senior mark.'" AutoZone, 373 F.3d at 801 (quoting Kellogg Co. v. Toucan Golf, Inc., 337 F.3d 616, 628 (6th Cir. 2003)).

to analyze whether such bad faith is present.[12]  However, while the Plaintiffs in this case discuss the Defendant's intent briefly as part of their likelihood of confusion analysis, they do not include any analysis of these factors.  Thus, the Court concludes that the Plaintiffs have not shown that they are entitled to summary judgment on these claims.

---

[12]  These factors include:

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

## CONCLUSION

For the foregoing reasons, the Court hereby GRANTS in part and DENIES in part the Plaintiffs' motion for summary judgment. Specifically, the Court grants the Plaintiffs' motion on their trademark infringement and unfair competition claims based on their "Seventh-day Adventist" mark. However, it denies summary judgment as to the Plaintiffs' trademark infringement and unfair competition claims premised on their "Adventist" and "SDA" marks and denies summary judgment as to the Plaintiffs' remaining claims.

**IT IS SO ORDERED** this 11th day of June, 2008.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE